Good morning. May it please the Court, Jonathan Wood, for the appellant, which I'll refer to collectively as the fisherman. The issue presented in this case is whether Congress has delegated to the U.S. Fish and Wildlife Service the authority to terminate several protections mandated by statute to protect Southern California's fishery and its fishermen from the consequences of the establishment of an otter population within the region. We contend that that issue can be resolved based on the clear text of the statute. The statute doesn't utter one word about authorizing termination or identify any criteria to guide the exercise of that power. On the contrary, Congress repeatedly used mandatory discretionless language to describe these conditions. It says that the agency shall adopt a regulation which must contain these protections. And for good measure, Congress said the agency shall implement those protections. Based on that, I think we can say that the statute unambiguously imposes a discretionless obligation on the agency to uphold its end of the bargain and respect these protections. Now, we dissect the statute and legislative history quite a bit in the briefs on both sides, and this morning I want to focus on two points, one on standing and one on the merits. First, on standing, the Court should affirm the decision below that the fishermen have standing based on their interest in the future of the fishery. And if you do, you don't have to reach the question of their standing as the objects of the regulation. But just in case the Court is inclined to say something about that theory of standing, I urge the Court to reject the ripeness arguments presented by the U.S. Fish and Wildlife Service. There is absolutely no ripeness problem in this case. This Court has repeatedly held that in order to have a ripe APA action, all you need is a recent final agency action, and it is undisputed that we have that here. The adoption of the 2012 rule, as this Court held in the previous appeal of this case, was a final agency action subject to pre-enforcement judicial review under the APA. My counsel, Judge Gould, if I could ask this question. On your argument about standing relating to the future of the fishery, how do you deal with redressability? We have redressability because the Supreme Court precedent and this Court precedent shows that all you need is an incremental step to knock out an absolute legal obstacle to the result you seek, and we do that. The Service's contention that it has no obligation to respect the statute's requirement to implement the management zone is a complete obstacle to the relief the fishermen seek. The argument the Service presents against redressability has been rejected by the D.C. Circuit as a breathtaking attack on the legitimacy of judicial review of agency actions, and here there are two reasons why that's clearly the case. First, the Service is the only party that can try to develop non-lethal feasible means to implement the management zone's protections. If you or I or the fishermen went out and tried to do that, we would be committing a federal crime because it is illegal to intentionally take a sea otter by catching it or trying to move it, and the statute puts the obligation on the Service to decide whether a particular means is feasible and non-lethal. So in those circumstances it is unfair to put the burden on the party challenging a complete obstacle to the relief they seek just because the Service contends that it's possible to exercise its discretion in the future in a particular way, and there is absolutely no precedent to support the notion that standing doesn't exist in those circumstances. Well, Counsel, if the Service has determined that scooping up sea otters out of the management zone and putting them somewhere else is going to be harmful to the sea otters, that it's going to disrupt their communities if they have families or whatever, and makes it harder for the otters to survive, how could our court order the Service to take that action? It wouldn't. So the statute is clear. The Service doesn't have to remove otters from the management zone using non-lethal or infeasible means. The standard Congress set is feasible and non-lethal. The relief we would be getting in this case is the restoration of that obligation so that if feasible non-lethal means are identified by the Service, it would have to implement them. But the Service has said that there are no feasible non-lethal means to remove, to relocate the sea otters, and it did that after experimenting with this program for several years and concluding that it was detrimental, contrary to the whole purpose of the statute to begin with. So how can you think that you would get any relief at all by having this issue go back to the Service for re-examination? So you're correct, Your Honor, that for three years the Service tried to implement this and in 1993 decided the means they had at the time were non-feasible and in fact lethal. Congress foresaw this possibility, and there's actually language in the legislative history explaining that there was an expectation the Service might have to work over time to develop those means. They might not be apparent from the beginning. And that's essentially the process that we're trying to restore. What Congress intended with the statute was that the Service would have an ongoing obligation to do this, and it's possible at any particular time it may not be able to find it. But just because the Service has this discretion on remand doesn't mean that its decision to completely obliterate the obligation to comply is not subject to judicial review. So they're telling most... That argument... Go ahead. Go ahead, Judge Pearson. No, no. Please, go ahead. Okay, well, what I was going to ask was this. If I were to assume for sake of argument that you're correct that there's addressability and standing, then you still have the issue of how the statute is to be interpreted. And I don't really understand the argument that the Service can't terminate an experimental program when the evidence they have shows that it's harmful to the sea otters. So the evidence doesn't show that the creation of the Southern California population is harmful to the sea otters. What it shows is that the implementation methods to capture and remove otters from the managed zone in 1993 were deemed to be lethal. But I think notwithstanding Congress's use of the word experimental, you can't ignore the express language in the statute. Congress decided that it was going to decide what the consequences of establishing an otter population in Southern California would be. If it meant to leave that to the Service's discretion, there would have been no reason for it to define all of the protections for the Southern California fishery or to use the mandatory non-discretionless language that it did. So here Congress said the agency must adopt this... Shall adopt this regulation, that it must contain specific protections defined by Congress. And for good measure, Congress said under the provision titled implementation, that the Service shall implement those protections. This is a statute where Congress decided that it would make the decision about what the consequences would be of establishing the program, not leave that to the agency. And I think it's important to remember what result the agency is defending here. Today, there is a healthy and growing population of sea otters on San Nicolas Island, and none of the protections that Congress said in the statute follow from that result apply. And it's clear on the face of the statute that that is the result Congress forbade. Well, the ones that are there have migrated there because of the ones that they moved there, something like only 14 of those survived out of what, 120 or 140? Isn't that about the situation? That's right. So the initial population was very small because most moved back to the parent population. Well, some of them died right after being brought there, too. Yes. So really, though, what you're asking this Court to do is to tell the Service, well, go back and try some other method of moving them, see if fewer of them died than did before? I mean, that's really what you're asking that this Court would do, isn't that what you're asking? No. We're simply asking the Court to overrule the Service's rule getting rid of those protections to the fishermen. It's not just a requirement to use feasible nonlethal means to enforce the Management Act. So you want to have the incidental taking rule operate to the benefit of your clients, even if the Department doesn't do anything with regard to moving any more sea lions, right? That's correct. Even if there were no feasible nonlethal means, that would still provide relief to our clients. And that has been the case for the last 25 years, the incidental take exemption has been in place up until 2012. The sea otter population has remained on St. Nicholas Island and has grown from that small population. The evidence in the record... No, not from that small population. My understanding is it's from migration. My understanding is that the small share of otters that stayed there is what created the foundation for the population. There's been migration into the management zone from the north, but that doesn't go to the Channel Islands. The population there is what grew out of the population established under this statute. And in 2012, that population was growing at a rate of about 7% and had already exceeded 50 otters. So the final point I want to make on the merits this morning is that if Congress anticipated and intended to give the service this authority to terminate these mandatory protections, it would have said so at some point. We have a statute that Congress enacted before the plan, which doesn't utter a word about termination or identify any criteria to guide its exercise. And we also have a statute on the same subject after 1993, when the service made these determinations and has said that the program failed, where Congress expressly relied on the continued implementation of these protections in excluding the sea otter from an otherwise broad amendment of the Marine Mammal Protection Act. Well, you're talking about Chevron 1 and Chevron 2. There's no question that Chevron 1 isn't applicable here. But on Chevron 2, then how can you say that the interpretation of the statute is not a permissible or reasonable one? So we believe in terms of Public Law 9965, it's clear on its face and unambiguous. So we would win on Chevron 1. On Chevron 2, if you go to that step, in addition to the repeated use of mandatory discretionless language, the context of the statute and legislative history reaffirm that this was a compromised statute. Congress was giving the service something, the power to create the population that exists on St. Nicholas Island today. On the condition that these protections for the fishery would be implemented. That is what allowed Congress to overcome the political conflict that was preventing the adoption of the statute for years. And the service's interpretation is completely inconsistent with that purpose. They argue that Congress silently, without providing any criteria to guide its hand, authorizes service to dispense with all of the fishermen's benefit of the bargain, even though under the results they've achieved today, they continue to enjoy theirs. Didn't the 1987 final rule include termination criteria? Yes. Doesn't that imply that the program could be terminated? So that rule is a regulation adopted by the service. It's not part of the statute. The statute was adopted in 1986. Did Semlin and your clients object back then to the termination criteria? I don't believe so. And this Court held in a previous appeal of this case that that is no obstacle to the fishermen challenging this final agency action on the grounds that it violates the statute. So even if their legal theory would mean that part of that regulation was also invalid, the APA allows for people to go into court and challenge more recently. But that only deals with your standing to challenge it. That doesn't mean that we're bound by anything from the previous court with regard to a Chevron 1 or a Chevron 2 determination. That's true. You're going to consider their interpretation in the regulation to interpret the statute, but it's the statute that you're interpreting. And that regulation didn't exist when Congress passed it in 1986. It did exist in 1993, but I think after when Congress amended the MMPA. But if Congress thought the agency could repeal these protections to the fishermen, it would have said something about that. It wouldn't have simply excluded the sea otter in reliance on implementation of this program. Of course, Congress could have also, if they didn't want the Department to have the Congress can always be more clear. But here you have no language in the statute that ambiguously or unambiguously authorizes termination. There's not a word about it. And Congress repeatedly used mandatory language to compel the adoption and implementation of these programs. In those circumstances, I think the statute is clear on its face. And even if it weren't, any counterinterpretation would be unreasonable. I'd like to remain the little time left I have for rebuttal. Thank you. All right. Thank you very much, Counsel. Good morning, Your Honors. May it please the Court. My name is Rachel Heron on behalf of the Federal Appellees. With me at Counsel's Table are Margaret Hall, Andrea Treese, and Linda Kropp for the Interveners. If it's agreeable to Your Honors, we will be sharing time, and the last five minutes of the argument will be taken by the Interveners. All right. In 2012, the Fish and Wildlife Service took the unexceptional step of terminating a non-mandatory sea otter conservation program that all the parties accept was a failure. And I know that there's a standing issue in this case, but if it's okay with Your Honors to go a little bit out of order, I'd like to start in with the statutory issue and particularly address what Counsel for the Appellants was saying just before he sat down about what we should make of the fact that there's not sort of an express statement in this statute that says, hey, if the program fails, this is what we should do. Now, the appellants have argued that because there's not that kind of a statement here, then the consequence must be that the service has no authority to terminate. But I think that when you look at this language that's in the statute, as well as the history and the purpose of this statute, you actually come to the absolute reverse result. And starting with the language, what Congress did here was give the service the option to enact a program. It told the service that any such program would have to be adopted by regulation, which is a format that generally allows for termination, absent some contrary indication. And it specifically said that the population that was set up in this regulation would be experimental. Now, given all of those indications in the statute, that this program would not necessarily have to endure forever, you would expect that Congress would say something if it actually intended for the program to have to continue for all time. And I think that that would be especially the case when you look at the history here, which was that at the time Congress passed this statute, there was already a proposed rule from the service saying this is what we plan to do if we get this statutory authority. And the preamble to that rule plainly states that if it is deemed a failure and it set forth criteria about failure, the program would be terminated. Counsel made the comment that this was a compromised statute. Was it compromised the very creation of the management zone so that it Certainly. I would say that I think the primary purpose of this statute was sea otter conservation, but we don't dispute that there was absolutely an attempt to compromise here. Now, I think the failure of this program makes the sort of compromise that was envisioned by the statute inapplicable. It kind of falls apart. Because when you look at how the statute was designed, the idea was that there would be an establishment of a new sea otter colony. And then in the area surrounding that colony, there would be this immunity from incidental take. The theory obviously being that perhaps this new colony of otters, its members would go out into this area where people are doing their jobs and potentially create hassles for them. Now, when you don't have an established colony on that island, the fairness impulse, the need, the justification for that area of incidental take immunity falls apart. And here in this case, we acknowledge that, yes, there are still otters on San Nicolas Island, not the number that would have established or would have constituted an established population as the service defined that term, but a number of otters. However, when you look at the record, it shows that the otters that are on San Nicolas Island are not venturing out into the management, the former management zone. The otters that, to the extent there are otters in that zone today, that are found there are these migrants from the parent population that have begun moving into the former management zone completely independently of setting up this San Nicolas Island population. Well, that's what I suggested to opposing counsel. And he said, oh no, that's not the case. Well, I think that, and I want to be clear on this. I think that the otters that are on San Nicolas Island now, our understanding is that those are descended from the otters that were originally brought to the island as part of this translocation program. The distinction that I was trying to draw is that the otters that are not on the island but are in this surrounding management zone, they are ones that have come from the parent population. All right, I understand. Thank you. And so I think that for all of those reasons, it doesn't make sense for there to be an expectation that the service would continue to sort of adhere to this compromise as it was set up forever with no ability to terminate it when all of the kind of factual predicates that made this compromise make sense have fallen apart in practice. And as I said, the service was clear at the outset that that was the plan, and Congress allowed this to go forward anyhow and didn't say anything to suggest that there would be no ability to terminate. In fact, when you look at the legislative history, there are numerous indications that we've pointed out in both committee reports and statements of individual legislators saying that this program would be able to be terminated. All of those factors, I think, show that even if this isn't a Chevron step one case in the service's favor, this was at least a reasonable interpretation in the event of the failures that occurred. And one other point I wanted to make is that there had been a question as to whether there had been any objection at the time this original rule was put forth in 1987 that included the termination criteria from the plaintiffs, the appellants in this case. And as we've pointed out, at least one of the appellants in this case, California Abalone, if you look at page 7 of the supplemental excerpts of record that were filed by the service, they in fact stated in comments during the development of this program that they were pleased to see termination criteria, all of which I think simply goes to show that the idea that this program could never be terminated I think is a relatively recent one, and I don't think it is a compelled reading of what this legislature is proposing. So I'm not urging that there are stops somehow from taking the position they are now. No, Your Honor. We're not arguing a stop. I think it simply shows that there are many, that this statute does not need to be read to require termination, and that it doesn't even need to be read to require that there never be termination in order to be fair to the fishing interests. Counsel, do you intend to ever get into the issue of standing? Yes, Your Honor. Because you're coming pretty close to the five minutes you gave to interviewers. I understand, Your Honor. I will turn to standing right now. So on the issue of standing, I think with regard to the argument that the plaintiffs are the objects of the regulation and that they have standing on that count, I think that both of the district court judges that underlie these two consolidated cases found that the presentation that the plaintiffs had made simply was not enough to get over the threshold there. Plaintiffs have talked about this as a ripeness concern, but I think Thomas and that line of cases . . . I thought one judge found standing and the other didn't. That's correct. One judge found standing based on the harm to the fisheries theories. Both judges rejected the argument that they had standing as objects of regulation. So on that objects of regulation point, we would, unless Your Honors have a question, rest on the briefs and the findings of the courts there. With regard to the harm to the fishery argument, we haven't contested that the potential of harm to the fishery would be a cognizable injury. The issue here is redressability. And I think that, you know, there's no precedent that would say that there's not . . . that there's a problem with redressability here. I would point this court to your decision in the Levine case, which was very similar in that you had a situation where you had a challenge to an agency action. But even if there was a success in that particular challenge, there would be no change in terms of the actual facts and ability to get a separate action that wasn't going to be influenced by the decision in the case at hand. Well, if the plaintiff wins here, wouldn't you have to go back and see if you could attempt to find a feasible, non-lethal way of removing the sea otters? Yeah. And I think what makes this . . . I think what matters here is that determination has already been made. And plaintiffs have, you know, agency tried for a couple years and then kind of gave up. But when you look at the record, what happened was the agency tried. It made adjustments. Those adjustments failed and it found that there were no feasible, non-lethal methods. And then when you . . . in the summary judgment briefing of the case that was before Judge Walter, plaintiffs in fact conceded that there were no feasible, non-lethal methods and that, therefore, there was no requirement that they continue. What about if we just said, well, let nature take its course? You know, there's some growing, at least in the management zone, of migration. And the incidental taking rule stays in effect and we just see what happens. Well, I think that that's a problem, Your Honor, and I want to be cognizant of the time for the interveners. But just to answer that question, I think it's important to keep in mind that although we have pointed out that we think that the fishermen's activities that have brought this case are very unlikely to cause incidental take in the management zone, they're not the only people that use the management zone. There are other types of fisheries, other types of activities, including construction or drilling activities, that could be very detrimental to sea otters, as we've pointed out in the record at various points. And so I think any solution that kind of created a kind of half sort of hybrid leftover of this program and left these otters vulnerable, especially considering that the otters that are in the management zone today are ones that came from the parent population who were never intended to be affected by this at all, given that Congress was very clear that the management zone was not to overlap with the parent population. I think that that is an outcome that is to be avoided and that it would be certainly preferable and consistent with the statute for this court to instead simply affirm the determination decision. All right. So now we will hear from the friends of the sea otter. Thank you, Your Honors. Good morning, Your Honors. Because of the notice of argument was two separate arguments, we had planned to split the time between the two arguments. All right. Go ahead. Two and a half minutes each, I guess. All right. Good morning, and may it please the Court. I'm Maggie Hall appearing on behalf of the Intervenor Conservation Groups. The critical merits question for this court today is whether the Fish and Wildlife Service had the authority to terminate a discretionary sea otter recovery program that harmed the very species the program was meant to protect. The answer to this question is yes, because Congress unambiguously expressed its intent through the text and purpose of the public law that should the sea otter recovery program fail, it could be terminated. In fact, no one disputes that the program was discretionary to begin with. That's because the key language of the law says the service may develop and implement the plan. Congress also made its intent clear that implementation might not be permanent by using the term experiment. An experiment is inherently uncertain because it tests a hypothesis that may or may not achieve an intended result, which here is recovery. And the mandatory terms that CSEC points to, like shall and must, only appear in provisions that alter the requirements of a plan should the service choose to implement one. They do not address whether the service has the authority to implement the program. And the statute really must be read in harmony. CSEC's reading would read the discretion and recovery language out of the statute. It would also produce absurd results requiring the Fish and Wildlife Service to implement a failed program, even though we know that 90% of the sea otters that were translocated either died, left, or disappeared. That would violate not only the public law, its implementing regulations, but also the Endangered Species Act and could not possibly be what Congress had intended. Instead, the statute must be read in light of its purpose and context. Here, the whole point of the translocation program came from the 1982 recovery plan when it was thought that the species could go extinct due to one catastrophic event. So creating an additional population was intended to prevent extinction. Therefore, the service started developing the program pursuant to Section 10J of the Endangered Species Act, but had to stop because of a conflict with the Marine Mammal Protection Act. But the point is, this was always intended to be a recovery program under the Endangered Species Act, and the terms of the statute have to be read in light of that recovery and conservation purpose. And if the service were to continue to implement the program, that would in fact violate the Endangered Species Act because they've already determined in their 2000 biological opinion that the implementation would cause jeopardy to the species as a whole. And, therefore, the service cannot, on the one hand, implement the failed program and not face liability under the ESA. Thank you. Thank you. Good morning, Your Honors. Andrea Treese on behalf of Intervenor Conservation Groups. I simply want to emphasize the context of Public Law 99-625 within the overall duty to avoid jeopardy under the Endangered Species Act. Nothing in that standalone statute exempted the service from its duty to make sure that its implementation of the program as a whole would not prevent the recovery of the California sea otter instead of promoting it as it was supposed to. And as my colleagues have noted, the service did determine that both the movement of individual otters and the containment of otters as a whole would prevent the recovery of the species and would, in fact, jeopardize its continued existence. And, therefore, the idea that the service would even be forced to find more means to move around individual otters also does not get at the service's core interpretation or determination that containing those otters and not allowing the species to naturally progress and expand its range, in fact, prevents its survival and recovery. Thank you. Thank you, counsel. Do you have a few minutes left? With my rebuttal time, I want to make two brief points, one on the statutory language and one on the equities. First, the court should not allow the one sentence in the statute that includes discretionary language to dwarf all of the explicit repeated mandatory language. In context, a sentence that says the service may develop and implement this plan is what allows the service to go forward notwithstanding that prior to the statute the Marine Mammal Protection Act would have forbidden the service from catching moving sea otters. That's what that sentence is doing. It's not saying that even though Congress says must and shall, it doesn't mean it. And you shouldn't let the hypothetical or theoretical possibility that the service had rejected the authority guide the interpretation because that was always far-fetched. The service had already came up with the idea of moving sea otters, lobbied Congress for years to get this statute passed, which was only possible because of this compromise. It's simply impossible to imagine that the agency might not have taken that authority. On the equities, I think it's important to remember what it is that the service is defending here. There is an established population on San Nicolas Island as a result of this compromise. It has got its benefit of the bargain, and yet the fishermen don't have theirs. The service didn't, for instance, try to adjust the management zone to reflect whether or not the parent population needs that area at the top. And the statute provides some criteria. It says the management zone shouldn't include an adjacent range where expansion is necessary for the recovery of the species. You're arguing that you should still be protected from incidental take. That's right. And that the statute doesn't give the service the broad authority to terminate it for whatever reason it wants. It would be something different if we were arguing about changing the boundaries to protect that parent population. Then we'd have different arguments. The statute would give us some criteria. Here, the service acknowledges there are no criteria at all to guide its decision making. Isn't your equity argument kind of the, well, the service is getting it both ways? In other words, they're getting a population growth, albeit it's in the management zone by migration. And at the same time, by their terminating the program, your people aren't going to get the incidental taking benefit. That's right. They're getting growth, both the parent population expanding into the managed zone and the existing population on San Nicolas Island is growing. The service has never contested that. The decision declared a failure was based solely on the population in 1990. It didn't at all consider what happened 22 years later when this decision was made. Now, I know the Court has set separate times for the two cases. Do I understand that we're happy to rest on the breeze if the Court just wants to consider them together? They're basically identical issues. Yes. Is there one additional issue in the second case that you want to raise? No. The only difference is they challenge different agency actions. One's a petition and one's the rulemaking, but on the standing and merits questions, they're the same. They're pretty much the same arguments. Right.  We don't have to re-argue. Okay. Thank you. We'll have the same ground again. All right. Thank you very much. The California Sea Urchin Commission v. Jacobson and the consolidated case of California Sea Urchin Commission v. Green are submitted.
judges: Wardlaw, Gould, Piersol